**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: WHITE MOUNTAIN MINING
COMPANY, L.L.C.,

*Debtor.*

---

JOSEPH C. PHILLIPS,

*Plaintiff-Appellee,*

and

MOWBRAY, L.L.C.,

*Defendant-Appellee,*

and

WHITE MOUNTAIN MINING COMPANY,
L.L.C., a West Virginia Limited
Liability Company,

*Reorganized Debtor-Appellee,*

v.

CONGELTON, L.L.C.,

*Defendant-Appellant,*

and

UNITED STATES TRUSTEE,

*Party in Interest.*

ALLIANCE CONSULTING,
INCORPORATED; ALPHA ENGINEERING
SERVICES; COMER ELECTRIC INC.;
UNSECURED CREDITORS' COMMITTEE,
Members of Creditors' Committee:

No. 04-1586

Gary Hartsog (Alpha Engineering
Services); James Billings (H&W
Mine Supply, Incorporated); Larry
Dye (Atlas Belt Service); Carl
Campbell (A&C Equipment &
Supply); Les Monk (Monk Mining
Supply, Incorporated); Cindy
Whitehead (POHL Corporation);
David A. Walls (Classic Conveyor
Company); Gregory Bailey (Frontier
Management, L.L.C.); Joe Parris
(Atlas Belt Service),

*Creditors.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
David A. Faber, Chief District Judge.
(CA-03-146-5; BK-02-50480; AP-02-99)

Argued: November 30, 2004

Decided: April 1, 2005

Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Michael wrote the opinion, in
which Judge Widener and Judge Motz joined.

**COUNSEL**

**ARGUED:** Eugene D. Gulland, COVINGTON & BURLING, Wash-
ington, D.C., for Appellant. John Joseph Nesius, SPILMAN,
THOMAS & BATTLE, P.L.L.C., Charleston, West Virginia; John
Allen Rollins, LEWIS, GLASSER, CASEY & ROLLINS, P.L.L.C.,

Charleston, West Virginia, for Appellees. **ON BRIEF:** Kara L. Cunningham, STEPTOE & JOHNSON, P.L.L.C., Charleston, West Virginia; Michael St. Patrick Baxter, Dennis B. Auerbach, Michael L. Rosenthal, COVINGTON & BURLING, Washington, D.C., for Appellant. Michael G. Sullivan, Columbia, South Carolina, for Appellees Joseph C. Phillips and Mowbray, L.L.C.

---

### OPINION

MICHAEL, Circuit Judge:

A core issue in an adversary proceeding in this chapter 11 bankruptcy case was also an issue in an international arbitration to be conducted in England. The bankruptcy court denied a motion to compel arbitration, refused to stay the adversary proceeding, and enjoined participation in the arbitration, all because the arbitration would have seriously interfered with the debtor's efforts to reorganize. We, like the district court, affirm.

#### I.

White Mountain Mining Company, L.L.C. (White Mountain), a limited liability company organized under the laws of Florida, was engaged in the coal mining business in southern West Virginia. As of December 31, 2000, White Mountain was owned by Joseph C. Phillips, a West Virginia coal operator, and Arquebuse Trust, a private trust wholly owned by Phillips. In January 2001 Phillips and Arquebuse Trust sold a fifty percent interest in White Mountain to White Trust, a foreign investment trust, for $7.5 million. The parties executed three documents in connection with the sale: a Sale Agreement between the two sellers and the buyer; an Operating Agreement between White Mountain, White Trust, and Arquebuse Trust to govern White Mountain's operations; and a letter dated January 19, 2001 (the January 2001 Letter), signed by White Trust and White Mountain to clarify certain matters prior to the closing. Following the sale White Trust assigned its one-half interest in White Mountain to Congelton, L.L.C., a West Virginia limited liability company; Phillips and Arquebuse Trust assigned their one-half interest in White Mountain to Mowbray, L.L.C., a company wholly owned by Phillips.

The Operating Agreement and the Sale Agreement contain arbitration clauses. The Operating Agreement requires that "each claim, dispute or controversy of whatever nature, arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement (or any other agreement contemplated by or related to this Agreement) . . . shall be settled, at the request of any party to this Agreement, by final and binding arbitration conducted in the City of London, United Kingdom . . . in accordance with the Commercial Arbitration Rules then in effect of the International Arbitration Association." J.A. 298-99. The Sale Agreement provides that disputes will be resolved "in accordance with the Arbitration provisions of the Operating Agreement as if set out herein." J.A. 262. Phillips is a party to the Sale Agreement, so he is bound by the arbitration provisions.

The agreements aside, White Mountain — with Phillips in charge — began operations at an underground mine in May 2001. Unfavorable geological conditions, which led to major roof falls, made mining extremely difficult. The mine was forced to shut down in November 2001. Between January 2001 and June 2002 Phillips advanced over $10.6 million of his own money to White Mountain, which was used to meet expenses. Congelton was warned that without "additional funds [or] outside financing . . . the company [would] have no choice, but to pursue the protection of federal bankruptcy." J.A. 307.

Congelton took the position that Phillips had misrepresented White Mountain's prospects and financial condition in order to induce White Trust to buy one-half of the company. In addition, Congelton maintained that Phillips was obligated under the Sale Agreement to ensure the adequacy of White Mountain's capitalization. Thus, Congelton claimed that Phillips's advances to White Mountain were contributions to capital, and Phillips claimed that the advances were loans pursuant to a provision in the January 2001 Letter. (The January 2001 Letter provides: "If White Mountain requires additional advances over the amount that was originally stated in the budgets and proforma's [sic], Phillips will advance the company the money and will be repaid for these advances after the company begins operations." J.A. 267.) In November 2001, as a result of this dispute, Congelton and White Trust served Phillips, Arquebuse Trust, and Mowbray with a demand for arbitration, to be conducted in London. In their August 13, 2002, statement of claim in the arbitration Congelton and White

Trust sought, among other forms of relief, "an award declaring that . . . advances made by Phillips to White Mountain should be treated as contributions to capital rather than as loans." J.A. 170.

In the meantime, on June 26, 2002, Phillips filed an involuntary Chapter 11 bankruptcy petition against White Mountain in the United States Bankruptcy Court for the Southern District of West Virginia. Two weeks later Phillips initiated an adversary proceeding in bankruptcy court against White Mountain, Mowbray, and Congelton. In the complaint Phillips sought a determination that White Mountain was indebted to him in the amount of $10,625,818 "for funds advanced by way of loans," J.A. 98, and that he was not obligated to advance additional money to White Mountain pursuant to the January 2001 Letter. In response to the complaint, Congelton moved the bankruptcy court (1) to compel Phillips to submit his claims to arbitration in London and (2) to stay or dismiss the adversary proceeding. The bankruptcy court denied Congelton's motion and enjoined it from prosecuting the pending arbitration. The court reasoned that because Phillips's complaint sought "a determination that [he] is owed money by the Debtor," it entailed a core proceeding under 28 U.S.C. § 157(b)(2)(B). J.A. 179. Moreover, the proceeding presented issues that were "critical to [White Mountain's] ability to formulate a Plan of Reorganization." J.A. 181. The arbitration, the court said, "clearly [sought] a determination of claims against White Mountain as well as a determination of the extent of equity holders in the entity." J.A. 181. Thus, the core proceeding trumped the arbitration, according to the bankruptcy court.

Congelton appealed the bankruptcy court's order denying arbitration to the district court, and both courts denied motions for a stay pending appeal. The bankruptcy court held a trial in the adversary proceeding and determined that Phillips's advance of $10.6 million to White Mountain was a loan made pursuant to the January 2001 Letter and that Phillips was not obligated to make further advances. The district court affirmed the bankruptcy court. Congelton now appeals to this court, arguing that (1) the bankruptcy and district courts erred in failing to enforce the arbitration agreement, (2) the bankruptcy court was divested of jurisdiction to try the adversary proceeding once Congelton appealed the denial of arbitration to the district court, and (3) the injunction against the London arbitration was invalid because it

was overly broad. We review de novo the conclusions of law reached by the district and bankruptcy courts, and we review the bankruptcy court's findings of fact for clear error. *Tavenner v. Smoot*, 257 F.3d 401, 405-06 (4th Cir. 2001).

## II.

Congelton first argues that the bankruptcy and district courts erred in failing to enforce the international arbitration agreement against Phillips. There is a strong federal policy in favor of arbitration, *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1985), and the Arbitration Act calls for the enforcement of valid arbitration agreements, *see* 9 U.S.C. § 2. This "federal policy applies with special force in the field of international commerce," *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 631 (1985), because the United States has acceded to the Convention on Recognition and Enforcement of Foreign Arbitral Awards (the Convention), December 29, 1970, 21 U.S.T. 2517. (The Convention is implemented in this country through the Arbitration Act, 9 U.S.C. § 201 *et seq.*) Any order to arbitrate in this case would be based on the Convention because White Trust, one of the parties to the arbitration agreement, is a foreign investment trust with a Swiss trustee. *See id.* § 202.

The Convention provides that "[t]he court of a Contracting State . . . shall, at the request of one of the parties [to an arbitration agreement], refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative, or incapable of being performed." Convention, art. II, para. 3. Congelton argues that the Convention's plain language requires enforcement of the arbitration agreement in this case. The issue is much more complicated than Congelton suggests because the Convention "contemplates exceptions to arbitrability grounded in domestic law." *Mitsubishi*, 473 U.S. at 639 n.21 (1985). Thus, Congress may "reserve [certain categories of claims] for decision by our own courts without contravening this Nation's obligations under the Convention." *Id.* "If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history,' or from an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/Am. Express, Inc. v.*

*McMahon*, 482 U.S. 220, 227 (1987) (quoting *Mitsubishi*, 473 U.S. at 628); *see also In re: United States Lines, Inc.*, 197 F.3d 631, 639 (2d Cir. 1999) (applying *McMahon* analysis to deny enforcement of international arbitration agreement in bankruptcy proceeding). After applying *McMahon*'s third ("inherent conflict") line of analysis, we reach the same conclusion as did the Second Circuit: "In the bankruptcy setting, congressional intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override even international arbitration agreements." *United States Lines*, 197 F.3d at 639.

The first alternative under *McMahon* is to ask whether the text of the bankruptcy laws reveal a congressional intent "to limit or prohibit waiver [through arbitration agreements] of [the bankruptcy] forum" for the litigation of core proceedings. *See McMahon*, 482 U.S. at 227. "Bankruptcy judges may hear and determine . . . all core proceedings arising under title 11 . . . and may enter appropriate orders and judgments, subject to review under section 158 of [title 28]." 28 U.S.C. § 157(b)(1). Core proceedings include, for example, "matters concerning the administration of the estate" and the "allowance or disallowance of claims against the estate." *Id.* § 157(b)(2)(A), (B). The adversary proceeding was a core proceeding because Phillips's complaint against White Mountain (the debtor) sought a determination that the advances of $10.6 million from Phillips to White Mountain were loans "due and owing" from White Mountain to Phillips. The claim in the London arbitration raised the same core issue, but sought the opposite determination (that the advances were contributions to capital).

Recognizing that Phillips brought a core proceeding, we return to the question of whether the text of the bankruptcy laws just cited reveals that Congress intended to limit or preclude the waiver of the bankruptcy forum for core proceedings. The Second Circuit in *United States Lines* did not deduce from the statutory text a congressional intent to prohibit entirely the arbitration of core issues: "a determination that a proceeding is core will not automatically give the bankruptcy court discretion to stay arbitration." 197 F.3d at 640. There is the counter argument, however, that the statutory text giving bankruptcy courts core-issue jurisdiction reveals a congressional intent to choose those courts in exclusive preference to all other adjudicative bodies, including boards of arbitration, to decide core claims. *See In*

*re: Summerfield Pine Manor*, 219 B.R. 637, 638 (B.A.P. 1st Cir. 1998) ("Clearly the Bankruptcy Court . . . cannot abstain from the administration of the bankruptcy case, leaving a state court to determine core matters. They are matters that arise exclusively under the Bankruptcy Code and related jurisdictional statutes establish jurisdiction in the district court and in the Bankruptcy Court, its delegatee."); *In re Caldor, Inc.*, 217 B.R. 121, 130 (Bankr. S.D.N.Y. 1998) (bankruptcy court's authority to refuse enforcement of arbitration clause depends largely on whether court has "core jurisdiction to adjudicate the claims that [the debtor's lessor] seeks to arbitrate"). We need not decide today whether the statutory text itself demonstrates congressional intent to override arbitration for core claims because this case may be decided under *McMahon*'s third line of analysis — whether congressional intent is deducible "from an inherent conflict between arbitration and the statute's underlying purposes." 482 U.S. at 227. This was the dispositive consideration in the *United States Lines* case, in which the Second Circuit upheld a bankruptcy court's decision refusing to refer core proceedings to arbitration. 197 F.3d at 641.

We thus turn to whether there is an inherent conflict between arbitration and the underlying purposes of the bankruptcy laws. "[T]he very purpose of bankruptcy is to modify the rights of debtors and creditors," 1 *Collier on Bankruptcy*, ¶ 3.02[2] (15th ed. rev. 2005) (quotation omitted), and Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts, *see Grady v. A.H. Robins Co.*, 839 F.2d 198, 201-02 (4th Cir. 1998); 28 U.S.C. § 157. Arbitration is inconsistent with centralized decision-making because permitting an arbitrator to decide a core issue would make debtor-creditor rights "contingent upon an arbitrator's ruling" rather than the ruling of the bankruptcy judge assigned to hear the debtor's case. Note, *Jurisdiction in Bankruptcy Proceedings: A Test Case for Implied Repeal of the Federal Arbitration Act*, 117 Harv. L. Rev. 2296, 2307 (2004).

Centralization of disputes concerning a debtor's legal obligations is especially critical in chapter 11 cases, like White Mountain's. The "fundamental purpose" of chapter 11 is rehabilitation of the debtor, "prevent[ing it] from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1983). To protect reorganizing debtors

and their creditors from piecemeal litigation, the bankruptcy laws "centralize all disputes concerning [a debtor's legal obligations] so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re: Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990).

The inherent conflict between arbitration and the purposes of the Bankruptcy Code is revealed clearly in this case, in which both the adversary proceeding and the London arbitration involved the core issue of whether Phillips's advances to the debtor were debt or equity. The bankruptcy court concluded that ordering arbitration and staying the adversary proceeding would substantially interfere with White Mountain's efforts to reorganize. The court found that an ongoing arbitration proceeding in London would (1) make it very difficult for the debtor to attract additional funding because of the uncertainty as to whether Phillips's claim was debt or equity, (2) undermine creditor confidence in the debtor's ability to reorganize, (3) undermine the confidence of other parties doing business with the debtor, and (4) impose additional costs on the estate and divert the attention and time of the debtor's management (even though the debtor was not a named party in the arbitration, the proceeding would necessarily involve the debtor's personnel and business records). The bankruptcy court noted that because resolution of the debt-equity issue was critical to the debtor's ability to formulate a plan of reorganization, the court would resolve the adversary proceeding on an expedited basis. Finally, the court found that allowing the adversary proceeding to go forward would "allow all creditors, owners and parties in interest to participate [in a centralized proceeding] at a minimum of cost." J.A. 181.

The bankruptcy court's findings are not clearly erroneous. These findings confirm that the London arbitration was inconsistent with the purpose of the bankruptcy laws to centralize disputes about a chapter 11 debtor's legal obligations so that reorganization can proceed efficiently. Indeed, in this case the arbitration would have substantially interfered with the debtor's efforts to reorganize. Accordingly, the bankruptcy court did not err in refusing to order arbitration between Congelton and Phillips, refusing to stay the adversary proceeding, and enjoining Congelton from pursuing the determination of a core issue in arbitration.

### III.

Congelton next argues that its notice of appeal to the district court — appealing the bankruptcy court's order denying the motion to compel arbitration — divested the bankruptcy court of jurisdiction over the adversary proceeding. Congelton bases this argument on a provision in the Arbitration Act, 9 U.S.C. § 16(a), which allows an interlocutory appeal from an order denying a motion to compel arbitration. Congelton filed its notice of appeal with the district court on February 24, 2003, and three months later on May 22, 2003, moved the district court to stay the adversary proceeding pending appeal. The district court denied a stay. Our court has not decided whether a stay of the entire action is required pending appeal of an order denying a motion to compel arbitration or whether the filing of an interlocutory appeal divests the trial court of jurisdiction. *See Hill v. Peoplesoft USA, Inc.*, 341 F. Supp. 2d 559, 560 (D. Md. 2004). In any event, these issues are now moot in this case. Judgment has been entered in the adversary proceeding, and we have held that the bankruptcy court was correct in denying the motion to compel arbitration and in refusing to stay the adversary proceeding pending arbitration. If Congelton is seeking to set aside the judgment in the adversary proceeding, it is not entitled to that relief. "*In no case* has a Court of Appeals granted [such] relief," that is, "undoing a trial because the district court lacked jurisdiction to proceed after an appeal from an order denying arbitration" that was ultimately affirmed. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 54 (2d Cir. 2004) (emphasis in original).

### IV.

Congelton's last argument is that the district court erred in affirming the bankruptcy court's broad injunction against the London arbitration. The bankruptcy court enjoined the arbitration between Congelton and Phillips in its entirety. The court invited Congelton on several occasions to file a motion to modify the injunction, but Congelton declined. On appeal Congelton does not request a modification of the injunction, but appears to argue that because the injunction is overbroad, it must be struck down entirely. *See* Brief for Appellant at 47 (arguing that the injunction must "stand or fall on its own terms"). The bankruptcy court was correct to enjoin Congelton from arbitrating a core issue that was critical to the debtor's reorganization effort,

so there is no ground for vacating the injunction in its entirety. Because Congelton does not request alternative relief, or suggest what alternative relief might be appropriate, we decline to modify the injunction.

V.

For the foregoing reasons, we affirm the orders of the district court affirming the decisions of the bankruptcy court.*

*AFFIRMED*

---

*We grant the Motion for Substitution of Party filed by the reorganized debtor, White Mountain Mining Company, L.L.C., a West Virginia limited liability company, to the extent of adding it as an appellee in this proceeding.