NIEMEYER, Circuit Judge,
writing for the court in Parts I, II.A, and III; and writing separately in Part II.B dissenting from the judgment in part.
To overcome financial difficulties, Oteria Moses of Goldsboro, North Carolina, borrowed $1,000 from Western Sky Financial, LLC, signing a consumer loan agreement in which she promised to repay Western Sky $1,500 and 149% interest, for an effective interest rate of 233.10% per annum. In signing the loan agreement, she agreed to make payments totaling $4,893.
While such a loan agreement was clearly illegal under North Carolina law, as it provided for an interest rate nearly 15 times the maximum allowable rate, Western Sky specified in the agreement that Indian tribal law would apply and that any dispute under the agreement would be resolved by arbitration conducted by a representative of the Cheyenne River Sioux Tribe.
When Moses sought protection in a Chapter 13 bankruptcy proceeding, Cash-Call, Inc., the loan servicer, filed a proof of claim, which Moses opposed on the ground that the loan was illegal and void. Moses also filed an adversary proceeding against CashCall (1) to declare the loan illegal and void and (2) to obtain damages for Cash-Call’s allegedly illegal debt collection activities. In a strategic attempt to avoid the bankruptcy court’s adjudication of Moses’ claims, CashCall sought to withdraw its proof of claim, but the bankruptcy court denied its request. CashCall simultaneously sought to dismiss the adversary action or to stay the proceeding and compel arbitration, which the bankruptcy court also denied. The district court refused to review the bankruptcy court’s interlocutory order denying CashCall’s motion to withdraw its proof of claim but agreed to review the bankruptcy court’s order denying CashCall’s motion to dismiss or compel arbitration. From the district court’s order affirming, CashCall filed this appeal.
We conclude that resolution of Moses’ claim for a declaratory judgment that the loan is illegal under North Carolina law could directly impact the claims against her estate and that sending this claim to tribal arbitration would substantially inter *67 fere with Moses’ efforts to reorganize. Thus, we hold that the district court did not err in affirming the bankruptcy’s court’s exercise of discretion to retain in bankruptcy Moses’ claim for a declaratory judgment.
Writing separately for myself in Part II.B, I would also affirm the district court’s exercise of discretion to retain in bankruptcy Moses’ claim to obtain damages for CashCall’s efforts to collect an allegedly illegal debt. That claim presents the exact same question as Moses’ claim for a declaratory judgment — namely, whether the loan agreement is invalid. Consequently, splitting the damages claim from the declaratory judgment claim and sending it to arbitration will be extremely inefficient, will present collateral estoppel concerns, and will waste resources that Moses could otherwise use to repay her debts. Such concerns are heightened in light of the fact that courts have called the tribal arbitration procedure specified in the loan agreement “illusory,” “a sham,” and “unconscionable.” See, e.g., Jackson v. Payday Fin., LLC, 764 F.3d 765, 768, 778-79 (7th Cir.2014). Therefore, I believe that the district court did not abuse its discretion in declining to send Moses’ damages claim to arbitration.
I
Facing financial difficulties, Moses signed a Western Sky Consumer Loan Agreement (the “Loan Agreement”) on May 10, 2012, promising to pay Western Sky “or any subsequent holder” $1,500, together with 149% interest. Upon signing the Loan Agreement, Western Sky gave her $1,000 in cash and “retained” $500 as a “prepaid finance charge/origination fee.” In the Loan Agreement’s “Truth in Lending Act Disclosure Statement,” Western Sky stated that the annual percentage rate for the loan was 233.10% and that the amount of all payments that would be made “as scheduled” would be $4,893.14. The 233.10% interest rate disclosed in the Loan Agreement far exceeded the 16%' maximum rate allowed by North Carolina law.
Western Sky, which gave its address in the Loan Agreement as a post office box in Timber Lake, South Dakota, was not licensed to make loans in North Carolina, as required by North Carolina law. The Loan Agreement provided, however, that it was “governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe” and that “no United States state or federal law applies to this Agreement.”
The Loan Agreement also provided that any disputes relating to it were to be resolved by arbitration, “which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative” (emphasis added), and it gave Moses the right to designate either the American Arbitration Association or JAMS “to administer the arbitration” in accordance with its rules and procedures “to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to arbitrate.” In signing the Agreement, Moses also agreed that she could elect to have the arbitration take place either on tribal land or within 30 miles of her residence, but she agreed that if she elected the latter, this “accommodation” would not “relinquish[ ] or waive[ ] ... the Cheyenne River Sioux Tribe’s sovereign status or immunity.” Courts that have considered loan agreements similar to the one at issue here have found that the Cheyenne River Sioux Tribe has no laws or facilities for arbitration and that the arbitration procedure specified is a “sham from stem to stern.” *68 Jackson, 764 F.3d at 779; see also Inetianbor v. CashCall, Inc., 768 F.3d 1346, 1354 (11th Cir.2014); Heldt v. Payday Fin., LLC, 12 F.Supp.3d 1170, 1191 (D.S.D.2014).
Three days after signing the Loan ■ Agreement, Moses received a notice from Western Sky that the Agreement had been sold to WS Funding, LLC, a subsidiary of CashCall, Inc., and would be serviced by CashCall.
On August 1, 2012, less than three months after signing the Loan Agreement and after having made only one payment on it, Moses filed a Chapter 13 bankruptcy petition in the Eastern District of North Carolina to reorganize her financial affairs. One week later, CashCall filed a proof of claim in the bankruptcy proceeding, asserting that Moses owed it $1,929.02 as of August 1. Moses objected to the proof of claim, contending that “the loan obligation was void and not enforceable in North Carolina” pursuant to two North Carolina statutes that prohibit unlicensed lending, see N.C. Gen.Stat. § 53-166(a), and limit interest rates to 16% per annum, see id. § 24-1.1(c). She also initiated an adversary proceeding by filing a two-count complaint seeking, in her first count, a declaratory judgment that the loan was “void ab initio ” under North Carolina law and, in her second, damages against CashCall under the North Carolina Debt Collection Act, id. §§ 75-50 to 75-56, for taking actions “to collect a debt that was not permitted under law.”
On October 25, 2012, the bankruptcy court confirmed Moses’ Chapter 13 plan without objection. The approved plan called for Moses to repay fully all secured, priority unsecured, and administrative claims over a five-year period but did not anticipate that there would be sufficient funds to repay any general unsecured claims.
After approval of the plan, but while the adversary proceeding was pending, Cash-Call filed simultaneous motions in the bankruptcy court to withdraw its proof of claim with prejudice and to dismiss Moses’ adversary proceeding without prejudice or, in the alternative, to stay the proceeding and compel Moses to arbitrate her claims pursuant to the Loan Agreement’s arbitration clause. In its motion to withdraw its proof of claim, CashCall stated that it “no longer wish[ed] to pursue its Proof of Claim and voluntarily abandoned] its claim for the outstanding balance of the loan to the Debtor.” But it did not consent to a finding that its loan was illegal and void under North Carolina law, as Moses alleged in her objection to the proof of claim and in her complaint in the adversary proceeding. Because Moses had already filed an adversary proceeding against CashCall, CashCall was not authorized to withdraw its proof of claim without court approval. See Fed. R. Bankr.P. 3006. Moses objected to Cash-Call’s motion to withdraw its proof of claim, maintaining that CashCall, which had filed 118 similar proofs of claim in the Eastern District of North Carolina to recover unsecured debts, sought to withdraw its proof of claim in her case only after she had challenged its practices “in an attempt to divest [the bankruptcy court] of jurisdiction” to hear her claims against it.
Following a hearing, the bankruptcy court entered two separate orders dated January 3, 2013. In the first, it denied CashCall’s motion to dismiss the complaint or to stay and compel arbitration. In doing so, the court concluded that Moses’ first claim in the complaint, which requested a declaratory judgment that CashCall’s loan was void, was a core bankruptcy proceeding, as it involved the “allowance or disallowance of claims against the estate,” citing 28 U.S.C. § 157(b)(2)(B). As to Mo *69 ses’ second claim, which sought damages under the North Carolina Debt Collection Act, the court concluded that the claim was non-core, over which it “lack[ed] constitutional authority to enter final judgment” and could therefore only recommend findings of fact and conclusions of law for a decision by the district court, citing id. § 157(c)(1). In the second order of January 3, the bankruptcy court denied Cash-Call’s motion to withdraw its proof of claim, finding that withdrawal “would cause prejudice to the Debtor by eliminating this Court’s jurisdiction over any causes of action related to the claim.”
CashCall sought leave from the district court to file interlocutory appeals with respect to both January 3 orders, as required by 28 U.S.C. § 158(a)(3), acknowledging that the district court had “discretionary jurisdiction to hear appeals from interlocutory rulings of the Bankruptcy Courts.” The district court .granted CashCall leave to appeal the interlocutory order denying its motion to dismiss or compel arbitration, but it denied Cash-Call leave to appeal the interlocutory order denying its motion to withdraw its proof of claim. On the appeal of the order denying CashCall’s motion to dismiss or compel arbitration, the district court affirmed the bankruptcy court’s order by order dated February 4, 2014.
CashCall filed a notice of appeal to this court “from the judgment and order of the District Court ... entered in this case on February 4, 2014, affirming an order of the Bankruptcy Court for the Eastern District of North Carolina that denied CashCall’s motion to dismiss or stay and compel arbitration of the underlying adversary proceeding.”
II
In her complaint in the adversary proceeding, Moses ' asserted two claims for relief. In the first, she sought a declaratory judgment that CashCall’s loan was illegal and unenforceable, in violation of N.C. Gen.Stat. § 24-l.l(c) and § 53-166(a). In her second claim, she sought damages for CashCall’s alleged violation of the North Carolina Debt Collection Act, N.C. Gen. Stat. §§ 75-51, 75-54, asserting that Cash-Call sought to enforce a debt that was void under North Carolina law.
The district court ruled that the bankruptcy court had jurisdiction over Moses’ first claim because it was “constitutionally core under Stern v. Marshall, — U.S. -, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011),” and “CashCall [did] not challenge this finding.” The district court then exercised its discretion to keep Moses’ second claim — that CashCall violated the North Carolina Debt Collection Act — in the bankruptcy case because sending it to arbitration “would frustrate, rather than facilitate, the efficiency favored by arbitration and could potentially lead to inconsistent results.” The court noted that “[t]he countervailing policy of the bankruptcy code is ... greatly served by allowing the bankruptcy court to consider both claims together and to enter findings of fact and conclusions of law on Moses’ non-core claim.”
CashCall challenges the district court’s conclusions, contending on appeal that both the core and non-core claims should be sent to arbitration. This is an expansion of the position that it took in the district court, where it argued only that Moses’ claim for damages under the North Carolina Debt Collection Act was a non-core proceeding and that “non-core proceedings are subject to arbitration, even in bankruptcy.” It now maintains that if both claims are sent to arbitration, “none of the matters to be decided will delay or diminish [Moses’] opportunity for a discharge, alter the Chapter 13 Plan, or in *70 crease the payments she is required to make.” Thus, it argues, arbitration would not conflict -with the policies underlying the Bankruptcy Code.
Moses argues to the contrary, noting that both of her claims are premised on the invalidity of the Loan Agreement and contending that the resolution of those claims would “directly impact[ ] the claims on the estate and the plan for [her] financial reorganization — the raison d’etre of Chapter 13 bankruptcy proceedings.” She maintains therefore that arbitration would conflict with the Bankruptcy Code’s purposes.
The underlying principles that are applicable here are not in dispute. Bankruptcy courts may decide core bankruptcy claims, which include the “allowance or disallowance of claims against the estate” and “counterclaims by the estate against persons filing claims against the estate.” 28 U.S.C. § 157(b)(2)(B)-(C). A bankruptcy court may also hear related non-core claims, but it cannot finally resolve them and must instead submit proposed findings of fact and conclusions of law to the district court. Id. § 157(c)(1).
The Supreme Court has modified these statutory assignments of responsibility, holding that Article III of the Constitution prohibits bankruptcy courts from issuing final orders regarding statutorily core claims unless they “stém[ ] from the bankruptcy itself or would necessarily be resolved in the claims allowance process.” Stern, 131 S.Ct. at 2618. And the Court has subsequently held that when a bankruptcy court is faced with a claim that is statutorily core but constitutionally non-core — a so-called “Stern claim” — it must treat the claim as if it were statutorily non-core, submitting proposed findings of fact and conclusions of law to the district court for de novo review. Exec. Benefits Ins. Agency v. Arkison, — U.S. -, 134 S.Ct. 2165, 2173, 189 L.Ed.2d 83 (2014).
Here, there is no dispute that Moses’ first claim, which seeks to declare that CashCall’s loan is unenforceable, is a statutorily core claim because such an action involves the “allowance or disallowance of claims against the estate.” 28 U.S.C. § 157(b)(2)(B). It is also constitutionally core, because the validity of the Loan Agreement would “necessarily be resolved” in adjudicating CashCall’s proof of claim and Moses’ objections thereto. Stern, 131 S.Ct. at 2618; see also, e.g., TP, Inc. v. Bank of Am., N.A. (In re TP, Inc.), 479 B.R. 373, 385 (Bankr.E.D.N.C.2012) (holding that “a counterclaim by the estate based in state law” will necessarily be resolved in ruling on a proof of claim if it “seek[s] to directly reduce or recoup the amount claimed”); Pulaski v. Dakota Fin., LLC (In re Pulaski), 475 B.R. 681, 687 (Bankr.W.D.Wis.2012) (holding that an objection to a proof of claim based on violations of state law was constitutionally core); In re Olde Prairie Block Owner, LLC, 457 B.R. 692, 698 (Bankr.N.D.Ill.2011).
Moses’ second claim, which seeks damages for CashCall’s violation of the North Carolina Debt Collection Act, is also statutorily core because it is a “counterclaim[ ] by the estate against [a] person[ ] filing [a] claim! ] against the estate.” See 28 U.S.C. § 157(b)(2)(C); see also, e.g., Burns v. Dennis (In re Southeastern Materials, Inc.), 467 B.R. 337, 360 (Bankr.M.D.N.C.2012) (holding that a cause of action seeking damages for a creditor’s unfair or deceptive trade practices, which had no bearing on the allowance or disal-lowance of a proof of claim, was a counterclaim by the estate); SJI, Inc. v. Staehnke (In re SJI, Inc.), 442 B.R. 690, 693 (Bankr.D.Minn.2010) (holding that a cause of action seeking damages for a creditor’s *71 breach of contract was a counterclaim by the estate). But the second claim is not constitutionally core. Even if a bankruptcy court were to determine that the underlying Loan Agreement was illegal, it would still need to determine whether an effort to collect an illegal debt would inherently violate the North Carolina Debt Collection Act, as Moses alleges. Thus, Moses’ claim would not “necessarily be resolved in the claims allowance process.” Stern, 131 S.Ct. at 2618; see also id. at 2616-17 (distinguishing the case before the Court, in which “the Bankruptcy Court was required to and did make several factual and legal determinations that were not ‘disposed of in passing on objections’ to [a] proof of claim,” id. at 2617 (quoting Katchen v. Landy, 382 U.S. 323, 332 n. 9, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966)), from a case where the legal elements of the claim and counterclaim were so overlapping that once the bankruptcy judge ruled on the creditor’s proof of claim “nothing remainfed] for adjudication,” id. at 2616 (quoting Katchen, 382 U.S. at 334, 86 S.Ct. 467) (internal quotation marks omitted)). Therefore, Moses’ second claim must be treated as if it were statutorily non-core. See Exec. Benefits Ins. Agency, 134 S.Ct. at 2173.
In sum, while the two claims in Moses’ complaint in the adversary proceeding are statutorily core claims, only the first claim is constitutionally core.
CashCall’s argument that both Moses’ core and non-core claims should be sent to arbitration rests essentially on its argument that the strong policy favoring arbitration outweighs the conflicting policies of the Bankruptcy Code in this case.
To be sure, the arbitration policies implemented by the Federal Arbitration Act (“FAA”), 9 U.S.C. §§ 1-14, are to be robustly followed. See, e.g., CompuCredit Corp. v. Greenwood, — U.S. -, 132 S.Ct. 665, 669, 181 L.Ed.2d 586 (2012) (“[The FAA] establishes ‘a liberal federal policy favoring arbitration agreements’ ” (quoting Moses H. Cone Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983))); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (“The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate ... ”). At the same time, however, “Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.” Celotex Corp. v. Edwards, 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (internal quotation marks and citation omitted). And in cases where tension arises between the FAA and another statute, the Supreme Court has provided a framework for resolving it, holding that the party seeking to prevent enforcement of an applicable arbitration agreement must show that “Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.” Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). That intent must be deducible from (1) the statute’s text; (2) its legislative history; or (3) “an inherent conflict between arbitration and the statute’s underlying purposes.” Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); see also Gilmer v. Interstate/Johnson Lane Corp., 895 F.2d 195, 197 (4th Cir.1990), aff'd, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Where such an intent can be deduced, the court of first impression has discretion to decide whether to withhold arbitration, a decision that-is subject to review for abuse of that *72 discretion. See Cont’l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 671 F.3d 1011, 1019-20 (9th Cir.2012); Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze), 434 F.3d 222, 228 (3d Cir.2006); Gandy v. Gandy (In re Gandy), 299 F.3d 489, 494 (5th Cir.2002). As to the constitutionally core claim in this case — Moses’ claim for a declaratory judgment — the bankruptcy court is the court of first impression to exercise discretion whether to withhold arbitration, but as to the non-core claim — Moses’ claim for damages — the district court is the court of first impression to exercise such discretion.
Moses does not contend that the Bankruptcy Code or its surrounding legislative history demonstrates an intent to create an exception to the FAA. Rather, she argues that sending her claims to arbitration would inherently conflict with the Bankruptcy Code’s purposes. Because Moses’ complaint contains both a constitutionally core and a non-core claim, each claim is analyzed separately.
A
With respect to Moses’ first claim, the constitutionally core claim, we conclude that sending it to arbitration would pose an inherent conflict with the Bankruptcy Code and that the district court did not err in affirming the bankruptcy court’s exercise of discretion in retaining it in bankruptcy.
While arbitration agreements are to be rigorously enforced, bankruptcy too represents a fundamental public policy. Grounded in the Constitution, bankruptcy provides debtors with a fresh start and creditors with an equitable distribution of the debtor’s assets. To those ends, a principal purpose of the Bankruptcy Code is to provide debtors and creditors with “the prompt and effectual administration and settlement of the [debtor’s] estate.” Katchen, 382 U.S. at 328, 86 S.Ct. 467; see also Celotex, 514 U.S. at 308, 115 S.Ct. 1493. Similarly, a principal purpose of the Bankruptcy Code is also to centralize disputes over the debtor’s assets and obligations in one forum, thus protecting both debtors and creditors from piecemeal litigation and conflicting judgments. See Phillips v. Congelton, L.L.C. (In re White Mountain Mining Co.), 403 F.3d 164, 169-70 (4th Cir.2005); A.H. Robins Co. v. Piccinin, 788 F.2d 994, 998 (4th Cir.1986). “Ease and centrality of administration are thus foundational characteristics of bankruptcy law.” French v. Liebmann (In re French), 440 F.3d 145, 154-55 (4th Cir.2006) (Wilkinson, J., concurring).
Inherently invoking these policies, Moses filed a Chapter 13 petition under the Bankruptcy Code and a five-year plan to reorganize her financial affairs, which the bankruptcy court approved in October 2012. In any Chapter 13 plan, even after the debtor proposes and the court approves a specific schedule of payments over a period of years, the plan “remains subject to modification for reasons including a debtor’s decreased ability to pay according to plan, as well as the debtor’s increased ability to pay,” Carroll v. Logan, 735 F.3d 147, 151 (4th Cir.2013), until the completion of plan payments, Pliler v. Stearns, 747 F.3d 260, 266 (4th Cir.2014).
It is thus apparent that resolution of Moses’ claim that the Loan Agreement she entered into with Western Sky was illegal could directly impact claims against her estate and her plan for financial reorganization, notwithstanding the fact that the plan was confirmed in October 2012. If a tribunal were to hold that CashCall’s loan is valid, CashCall could petition the bankruptcy court as an “allowed unsecured creditor” to share in Moses’ assets. See Murphy v. O’Donnell (In re Murphy), 474 F.3d 143, 148 (4th Cir.2007) (noting that *73 plan modification can be initiated by “the debtor, the Chapter 13 trustee, or an allowed unsecured creditor”). And the fact that unsecured creditors are currently anticipated to receive nothing under Moses’ confirmed plan does not mean that they never will. See Pliler, 747 F.3d at 265 (noting that creditors may gain from a debtor’s Chapter 13 reorganization “even if the debtor[ ] ha[s] zero or negative disposable income at the time of plan confirmation,” because “Chapter 13 debtors can and do benefit from windfalls such as inheritances or other unforeseeable income after plan confirmation but before their Chapter 13 proceedings are closed”). Under these circumstances, ordering arbitration of a dispute that directly pertains to Moses’ plan for reorganization would “substantially interfere with [her] efforts to reorganize.” Phillips, 403 F.3d at 170; see also id. at 169 (holding that “[arbitration is inconsistent with [the Bankruptcy Code’s policy of] centralized decision-making because permitting an arbitrator to decide a core issue would make debtor-creditor rights contingent upon an arbitrator’s ruling rather than the ruling of the bankruptcy judge assigned to hear the debtor’s ease” (emphasis added) (internal quotation marks and citation omitted)).
Therefore, we conclude that forcing Moses to arbitrate her constitutionally core claim would inherently conflict with the purposes of the Bankruptcy Code and that the district court did not err in affirming the bankruptcy court’s exercise of discretion in denying CashCall’s motion to dismiss or stay and compel arbitration of that claim.